**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GABRIEL MCMORLAND,<br>Plaintiff,<br>v.<br>MUD PIE, LLC,<br>Defendant. | Case No. |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Gabriel McMorland, by and through her undersigned counsel, seeks a permanent injunction requiring a change in Mud Pie, LLC's ("Defendant") corporate policies to cause its online store to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiff respectfully asserts as follows:

## GENERAL BACKGROUND

1. This lawsuit is calculated to enforce Gabriel McMorland's right to access the goods and information offered on Defendant's Mudpie website.

2. Gabriel McMorland ("McMorland," "Plaintiff" or "she/her") has been blind for her entire adult life.

3. She is the former Executive Director of the Thomas Merton Center, a well-known Pittsburgh-based advocacy organization which describes its mission as follows:

> The Thomas Merton Center works to build and support collaborative movements that empower marginalized populations to advance collective liberation from oppressive systems.[1]

[1] https://www.thomasmertoncenter.org/mission, last visited January 20, 2026.

4. Among the specific advocacy goals of the Thomas Merton Center is: "Ensuring accessibility for every interested participant." *Id.*

5. Prior to joining the Merton Center, McMorland was a digital accessibility consultant for the University of Pittsburgh as well as an accessible arts consultant for the Carnegie Museums of Pittsburgh.

6. In addition, McMorland previously served as a task force member on the Pittsburgh/Allegheny County City-County Task Force on Disabilities and as a member of the City of Pittsburgh Commission on Human Relations and is a board member for Pittsburghers for Public Transit.

7. When she was in college, Plaintiff began to lose her vision as the result of an unexpected genetic mutation, and she has been legally blind since 2001 and does not have the visual ability to read or perceive images.

8. As a result of her personal and professional background, McMorland is uniquely positioned to recognize that evolving digital technologies present an unprecedented opportunity for the vision impaired community to have increased independent access to goods and services – so long as those technologies are, in fact, accessible.

9. The National Federation of the Blind has highlighted this fact as follows:

> Individuals with disabilities often rely on websites to overcome the systemic transportation, communication, architectural, and other barriers that pervade our society. A blind person can review and save coupons using a website that would have otherwise required a sighted assistant. A deaf or hard-of-hearing person can participate in a conversation through a Web-based platform more freely than they would be able to in person. Many autistic people can more independently review information about a store's offerings online. And the 24-hour-a-day availability of information and transactions on websites provides a level of independence and convenience that cannot be replicated through any other means.

> The lack of accessible websites has far reaching effects on virtually every aspect of the lives of individuals with disabilities . . . .

*See* Amicus Brief filed on behalf of the National Federation of the Blind, et al., in *Winn-Dixie Stores, Inc. v. Juan Carlos Gil*, Case No. 17-13467 (11th Cir. Dec. 20, 2017).[2]

10. To access websites, McMorland uses VoiceOver screen reader software,[3] which "translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y. 2017) (J. Weinstein):

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.
>
> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with her keyboard.

*Id.*; *See also* American Foundation for the Blind, *Screen Readers*, *available at* https://www.afb.org/blindness-and-low-vision/using-technology/assistive-technology-products/screen-readers (last accessed January 20, 2026) (discussing screen readers and how they work).

11. McMorland is an experienced and competent user of screen reader software.

[3] "VoiceOver" is screen reader software included in iOS, the operating system on Apple's iPhone.

12. She is aware of the Department of Justice's longstanding position that the Americans with Disabilities Act ("ADA") requires that websites be accessible to individuals with vision impairments.

13. Based upon her personal experiences and knowledge, McMorland is also aware that a significant percentage of websites that offer goods and services to the public have material access barriers which limit or altogether prevent a vision-impaired individual's access to the websites.

14. McMorland believes that the importance of accessible technologies to her personally and to the vision-impaired community generally was amplified during the recent pandemic. She believes that as the world becomes more dependent upon digital technology and takes a permanent step away from brick-and-mortar businesses, the vision-impaired community risks being left behind.

15. To ensure her continued access to goods and services in the digital economy, McMorland has filed this lawsuit (and other similar lawsuits) calculated to enforce her federal rights under the ADA.

16. In this lawsuit and in other similar cases, McMorland would never agree to a resolution unless it included material improvements to accessibility and ongoing monitoring by her counsel to ensure that those improvements are implemented and maintained.

## ACCESSIBILITY BARRIERS ON DEFENDANT'S WEBSITE

17. Defendant sells, *inter alia*, décor and home goods.

18. Defendant is responsible for the policies, practices and procedures concerning the website's development, maintenance and content.

19. Within the relevant limitation period, Plaintiff attempted to access Defendant's website using VoiceOver screen reader software on her iPhone.

20. Defendant's website was unusable by Plaintiff as a result of myriad access barriers, which are described in detail at Paragraph 26 of the Complaint.

21. Web-based technologies have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible website will not cause the website to remain accessible without a corresponding change in corporate policies related to those web-based technologies. Jonathan Lazur et al., *Ensuring Digital Accessibility Through Process and Policy 140* (2015). As one leading commentator notes,

> The most significant problem is maintaining the accessibility of a large commercial site. Without policies, procedures and metrics—such as testing a release for accessibility before posting to the website and training in accessible design (so that accessibility is part of the design process the way, say, cybersecurity is)—the site's status as accessible will be temporary at best.

*Fighting for Accessible Websites under the ADA: Daniel Goldstein, Brown Goldstein Levy, Baltimore*, Bloomberg BNA, Jan. 13, 2016, ISSN 1098-5190 (reproduced with permission from Electronic Commerce & Law Report, 21 ECLR, 2, 1/13/16).

22. To evaluate whether an inaccessible website has been made materially more accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the website to remain accessible, the website must be reviewed on a periodic basis with end user testing by disabled individuals.

> [I]f you have planned to redesign or add a certain segment to your site, then make it accessible from the start. It's far cheaper to plan for an elevator than to decide to add one once your 30-story building is complete. Or if you are re-branding, consider using templates that will ensure accessibility. Make sure you have policies, procedures and metrics in place so that you know if you are maintaining accessibility and can identify why, if you are not. Most of all, consult disabled consumers or a consumer organization before deciding what you are going to do, and have consumers actually test the changes.
>
> Something you imagine you may need to do, you may not need to do at all or may

> be able to do much cheaper. Something you hadn't thought to do may be critical to accessibility. And, of course, if you work with the disability community, they will spread the word that this is no longer a site to be avoided, but to be used.

*Id*. at 3.

23. Against the above backdrop, Plaintiff files this Complaint to enforce Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("Title III"), which requires, among other things, that a public accommodation (1) not deny persons with disabilities the benefits of its services, facilities, privileges and advantages; (2) provide such persons with benefits that are equal to those provided to nondisabled persons; (3) provide auxiliary aids and services—including electronic services for use with a computer screen reading program—where necessary to ensure effective communication with individuals with a visual disability, and to ensure that such persons are not excluded, denied services, segregated or otherwise treated differently than sighted individuals; and (4) utilize administrative methods, practices, and policies that provide persons with disabilities equal access to online content.

**<u>JURISDICTION AND VENUE</u>**

24. The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

25. Defendant participates in the Commonwealth's economic life by clearly performing business over the Internet. Through its website, Defendant enters into contracts for the sale of its products with residents of Pennsylvania. These online sales contracts involve, and indeed require, Defendant's knowing and repeated transmission of computer files over the Internet. *See Gniewkowski v. Lettuce Entertain You*, Order, ECF No. 123 (W.D. Pa Apr. 25, 2017) *clarified by* Order of Court, ECF No. 169 (W.D. Pa. June 22, 2017) (Judge Schwab) (exercising personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum website

operator); *see also Access Now Inc. v. Otter Products, LLC*, 280 F.Supp.3d 287 (D. Mass. Dec. 4, 2017) (same); *Access Now, Inc. v. Sportswear, Inc.*, 298 F.Supp.3d 296 (D. Mass. 2018) (same).

26. As described in additional detail below, Plaintiff has been injured when she attempted to access Defendant's website from this District but encountered barriers that denied her full and equal access to Defendant's online goods and content. These digital barriers also interfere with Plaintiff's full and equal enjoyment of the goods and services offered at Defendant through the website. The barriers detailed below are not a comprehensive catalog of the website's accessibility deficiencies.

a. Plaintiff encountered multiple elements on the website that lacked meaningful labels. For example, sighted shoppers will see a right-pointing arrow in the promotion banner at the top of the screen and will understand that they can scroll through promotions by clicking this element.




When Plaintiff focused on this element she heard “link” which did not convey the purpose of the element[4];

b. The homepage includes a carousel with slides informing users of promotions offered on the website. When Plaintiff focused on each of these slides she heard “Banner Item, Link, Image.” These descriptions failed to communicate the nature of the offers;

---

[4] “Focus” in the context of VoiceOver and other screen reader software refers to the software narrating elements of, inter alia, websites and applications. For example, when a user focuses on a block of text, screen reader software will narrate that text. When a user focuses on a correctly labeled and formatted link, screen reader software will read the label (e.g., “Men’s Clothing”) followed by the word “link.”

c. The homepage includes a navigation menu, which is displayed as three horizontal lines in the upper left corner of the screen. Sighted shoppers clicking on this element will see a menu expand from the lefthand side of the screen, displaying collapsed category lists such as "What's New" and "Home." Clicking these collapsed elements reveals links to relevant areas of the website




Plaintiff found this element unusable. Rather than listing each category as a discrete element, she found that all of the collapsed categories were contained in one element, and that she was unable to focus on any one category. When attempting to use the menu she heard a string of text: "What's New Home Baby & Kids Women Seasonal Gift Guides Sale Valentine's Day Customer Care Inspire." She could not, for example, focus on and expand the "Women" element;

d. Certain pages on the website include a filter element that allows users to refine products displayed on the page by criteria such as "New" or "Season." VoiceOver announced multiple items within the filter element as "unpronounceable." Plaintiff was not able to independently determine the purpose or nature of these elements;

e. The website uses struck-through text to indicate the original price of discounted items.




VoiceOver does not distinguish between ordinary and struck-through text, meaning Plaintiff did not hear a clear indication of the significance of the two prices;

f. Certain items on the website are offered in multiple sizes and colors. Sighted shoppers will see darkened borders around their selected size and color. No equivalent confirmation is provided to VoiceOver users;

g. When items are not available in one size, sighted shoppers will see a diagonal red line through the element corresponding to that size. VoiceOver users will hear no equivalent notification; and

h. The website displays products' average user ratings on a five-star scale. Plaintiff heard silence when focusing on each star.

## PARTIES

27. Plaintiff is and, at all times relevant hereto, has been a resident of this District. Plaintiff is and, at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*.

28. Defendant is a Delaware limited liability company doing business at 4893 Lewis Road, Suite A, Stone Mountain, GA, 30083.

## HARM TO PLAINTIFF

29. If the website was accessible, Plaintiff could independently research and purchase Defendant's products. She has attempted to access the website and has been unable to use the website as a result of material access barriers. While she desires to access the website to assess Defendant's product offerings, prices and other information, she is deterred from continuing to attempt to use the website.

30. Though Defendant purports to have centralized policies regarding the maintenance and operation of its website, Defendant has never had a plan or policy that is reasonably calculated

to make its website accessible to, and independently usable by, individuals with vision related disabilities. As a result, the access barriers on the website are ongoing and likely to persist.

31. The law requires that Defendant reasonably accommodate Plaintiff's disabilities by removing these access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense. Many other online retailers offer their goods and/or services through accessible websites.

32. Plaintiff has been, and in the absence of an injunction will continue to be, injured by Defendant's failure to provide its online content and in a manner that is compatible with screen reader technology.

**SUBSTANTIVE VIOLATION**
**Title III of the ADA, 42 U.S.C. § 12181 *et seq*.**

33. The assertions contained in the previous paragraphs are incorporated by reference.

34. Defendant's website is a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7). *See Suchenko v. ECCO USA, Inc.*, 2018 WL 3933514, *3 (W.D. Pa. Aug. 16, 2018) ("Simply put, Defendant in the instant case, like other corporate defendants in *Gniewkowski* and *Suchenko*, purportedly owns, operates, and/or controls the property upon which the alleged discrimination has taken place—i.e., its website. Therefore, Plaintiff in this case has a nexus to the place of public accommodation and thus may claim the protections of Title III.").

35. In the broadest terms, the ADA prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. 42 U.S.C. § 12182(a). Thus, to the extent Defendant does not provide Plaintiff with full and equal access to its website, it has violated the ADA.

36. In more specific terms, Title III of the ADA imposes statutory and regulatory requirements to ensure persons with disabilities are not excluded, denied services, segregated or otherwise treated differently than other individuals as a result of the absence of auxiliary aids and services. 42 U.S.C. § 12182(b)(2)(A); 28 C.F.R. §§ 36.303(a), (c). Under these provisions, public accommodations must furnish appropriate auxiliary aids and services that comply with their effective communication obligations. *Id.*

37. Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service or fails to provide a like experience to the disabled person.

38. Auxiliary aids and services include, but are not limited to, audio recordings, screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology, other effective methods of making visually delivered materials available to individuals who are blind or have low vision, and other similar services and actions. 28 C.F.R. §§ 36.303(b)(2), (4).

39. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. §§ 36.303(c)(1)(ii). To this end, the Ninth Circuit has explained, "assistive technology is not frozen in time: as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).

40. By failing to provide its website's content and services in a manner that is compatible with auxiliary aids, Defendant has engaged, directly, or through contractual, licensing,

or other arrangements, in illegal disability discrimination, as defined by Title III, including without limitation:

(a) denying individuals with visual disabilities opportunities to participate in and benefit from the goods, content, and services available on its website;

(b) affording individuals with visual disabilities access to its website that is not equal to, or effective as, that afforded others;

(c) utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

(d) denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others; and/or

(e) failing to make reasonable modifications in policies, practices, or procedures where necessary to afford its services, privileges, advantages, or accommodations to individuals with visual disabilities.

41. Defendant has violated Title III by, without limitation, failing to make its website's services accessible by screen reader programs, thereby denying individuals with visual disabilities the benefits of the website, providing them with benefits that are not equal to those it provides others, and denying them effective communication.

42. Defendant has further violated Title III by, without limitation, utilizing administrative methods, practices, and policies that allow its website to be made available without consideration of consumers who can only access the company's online goods, content, and services with screen reader programs.

43. Making its online goods, content, and services compatible with screen readers does not change the content of Defendant's website nor result in making the website different but enables individuals with visual disabilities to access the website Defendant already provides.

44. Defendant's ongoing violations of Title III have caused, and in the absence of an injunction will continue to cause, harm to Plaintiff and other individuals with visual disabilities.

45. Plaintiff's claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

46. Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Plaintiff requests relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

(A) A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure that its website is fully accessible to, and independently usable by, individuals with visual disabilities;

(B) A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to bring its website into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its website is accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant

has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law;

(C) Payment of costs of suit;

(D) Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment. *See People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 235 (3d Cir. 2008) ("This Court, like other Courts of Appeals, allows fees to be awarded for monitoring and enforcing Court orders and judgments."); *see also Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191); *see also Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11);

(E) Whatever other relief the Court deems just, equitable and appropriate; and

(F) An Order retaining jurisdiction over this case until Defendant has complied with the Court's Orders.

Dated: January 20, 2026

Respectfully Submitted,

/s/ *Ian M. Brown*
R. Bruce Carlson (PA 56657)
Ian M. Brown (PA 201680)
**CARLSON BROWN**
222 Broad St.
PO Box 242
Sewickley, PA 15143
bcarlson@carlsonbrownlaw.com
ibrown@carlsonbrownlaw.com
(724) 730-1753

*Counsel for Plaintiff*